# IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

S.F., by his Parents,            :
K.F. and E.I.,             :
         Plaintiff,      :
                     :
         v.            :
                     :
SCHOOL DISTRICT OF UPPER    :      No. 17-4328
DUBLIN,             :
         Defendant.    :

## MEMORANDUM

Plaintiff, S.F., through his parents K.F. and E.I. ("Plaintiff" or "S.F."), brought suit in 2017 against the School District of Upper Dublin ("Defendant" or the "District"), for violations of the Americans with Disabilities Act, 42 U.S.C. §§ 12131-34 ("ADA"), and Section 504 of the Rehabilitation Act, 29 U.S.C. § 794, concerning architectural barriers to S.F.'s motorized wheelchair at Sandy Run Middle School. Doc. 1 ("Comp."). The litigation resulted in a negotiated consent decree approved by the court on September 20, 2018. See Docs. 55 & 63-2 at 1 ("Order"); Consent Decree, Doc. 63-2 at 2-33 ("Consent Decree").[1] Presently before the court is Plaintiff's motion to enforce the Consent Decree (Doc. 62), and Defendant's response and cross-motion to modify the Consent Decree (Doc. 65). For the following reasons, Plaintiff's motion will be granted and Defendant's cross-motion will be denied.[2]

---

[1]The Order was entered by the Honorable Gerald J. Pappert, to whom this matter was formerly assigned. The parties thereafter consented to magistrate judge jurisdiction, and Judge Pappert transferred the case to the undersigned. Docs. 56 & 57.

[2]The court retains jurisdiction to interpret and enforce the Consent Decree. Order ¶ 3; Consent Decree ¶ 46.

# I.    BACKGROUND

## A.    The Consent Decree

When the Complaint was filed, S.F. was in the fourth grade, and would begin attending middle school in the sixth grade. Comp. ¶¶ 4, 8. The 29-page Consent Decree mostly pertains to modifications to the existing middle school building to make it accessible to S.F. Consent Decree ¶¶ 4-26. In addition, at the time of the Consent Decree, the District was planning to build a new middle school, which the parties also addressed in the Consent Decree. That building is now under construction, and Plaintiff's motion seeks to compel modifications to the District's plans for the auditorium in the new building. Plaintiff moves pursuant to the Consent Decree's third paragraph, entitled "New middle school facility," which states in full:

> a. It is the District's plan to construct a new middle school and associated grounds ("New Middle School"), which is scheduled to be completed for the 2022-23 school year. The District will construct the New Middle School so that it is accessible to and usable by S.F. The District will ensure that the New Middle School fully complies with the 2010 [ADA] Standards for Accessible Design codified at 28 C.F.R. § 36 Appx. A ("2010 ADA Standards").[3]
> b. The District will provide construction plans for the New Middle School sufficient for Plaintiff to determine whether the New Middle School meets the terms of this Consent Decree to Plaintiff by August 9, 2019. Within 30 days of receiving the plans, Plaintiff will submit to Defendant any concern regarding compliance with the 2010 ADA Standards to Defendant. Any agreement regarding modifications to the construction plans will be reduced to writing as an Addendum to this consent decree. If Defendant does not provide corrected plans fully addressing an issue raised by Plaintiff within 30 days of being notified of the issue

---

[3]The relevant 2010 ADA Standards are attached to Plaintiff's motion. Doc. 63-5.

> by Plaintiff, Plaintiff shall have the right to seek enforcement of this Consent Decree or modification of the plans from the Court to reflect the obligations of the District as required by the Consent Decree. Defendant shall not be entitled to claim that a modification cannot be made because making the modification will interfere with or delay the construction schedule. The District will provide a copy of any revised plans to Plaintiff. The agreed-upon plans will be identified in a separate writing and incorporated into this Consent Decree by reference.

Id. ¶ 3.

Middle school in the District runs from sixth grade through eighth grade. See Declaration of Steven Yanni, Ed.D. (District Superintendent), Doc. 65-3 ("Yanni Dec."), ¶ 6. S.F. is currently in seventh grade and is scheduled to finish seventh grade at the end of this school year. Id. ¶ 4. As a result, S.F.'s last year in middle school is expected to be the 2021-22 school year. Id. ¶ 5. According to the District, at the time the Consent Decree was executed, it believed that the New Middle School would not be completed until the start of the 2022-23 school year, but it was possible that the New Middle School would be ready in time for some portion of the 2021-22 school year, when S.F. would still be a middle school student. Doc. 65-1 at 2 n.2, 3-4; Declaration of M. Arif Fazil, P.E. (Defendant's engineer), Doc. 65-4 ("Fazil Dec."), ¶ 14. It is now certain that the New Middle School will not be completed for student occupancy until the 2022-23 school year, by which time S.F. will be in ninth grade and no longer attending middle school. Yanni Dec. ¶ 8; Fazil Dec. ¶ 14. Plaintiff does not dispute that S.F. will not be a middle school student in the New Middle School. Declaration of K.F. and E.I., Doc. 68-6, ¶ 6. By its terms, the Consent Decree terminates once S.F. completes middle school, Consent Decree ¶ 47, which as noted is not expected to be until the spring of 2022.

## B.      The New Middle School Auditorium

The plans for the New Middle School include a 468-seat[4] auditorium, illustrated by a notated design drawing appended to this Memorandum.[5]  The diagram is oriented with the front, or stage end, toward the top of the drawing and the rear, or main entry end, toward the bottom of the drawing.  In order from the top of the diagram to the bottom are a corridor with entrance/exit doors to the stage end of the auditorium, the stage with a corridor on either side of the stage, the well or pit area ("well") between the stage and the front row of seats, the seating area, the main entrance/exit doors after the rear row of seats, and a vestibule with entrance/exit doors leading to the outer corridor.  In the seating area are fifteen rows of seats divided into three sections (left, center, and right) with four aisles that run from the well to the rear of the auditorium.  All of the entrance/exit doors are accessible.[6]  The auditorium includes eight wheelchair accessible seats, marked on the

---

[4]There is a slight discrepancy in the experts' seat count.  See Declaration of Kimberly LaBrake, AIA, NCARB (Defendant's architect), Doc. 65-7 ("LaBrake Dec."), ¶ 41 (468 seats); Declaration of Daniel Hersh, Jr., A.I.A., LEED AP BD+C (Defendant's architect), Doc. 65-8 ("Hersh Dec."), ¶ 34 (468 seats); Declaration of Dominic Marinelli (Plaintiff's accessibility expert), Doc. 63-3 ("Marinelli Dec."), ¶ 28 (467 seats).

[5]Both parties have provided renderings of the auditorium, which are all based on the drawings prepared by the District's architects.  See Marinelli Dec. at Exhs. A & B (Doc. 63-3 at 18 & 20); LaBrake Dec. at Exh. 2 (Doc. 65-7 at 20).  The last of these is the version appended to this Memorandum.  It provides an overhead view depicting the auditorium layout, with handwritten notations added by the architects "to provide data that is otherwise only apparent from other sheets of the design."  LaBrake Dec. ¶ 39.

[6]The term "accessible" is defined as compliant with the 2010 ADA Standards. 2010 ADA Standards § 106.5.  The accessibility of restrooms is not at issue.  The drawing depicts a ramp inside each stage entrance door leading along either side of the stage. These ramps are not discussed in the briefs, and Plaintiff has raised no objection to their accessibility.  I will refer to these areas as corridors along either side of the stage.

diagram with wheelchair icons.  Four are in the first row -- one in the front left, two in the front center, and one in the front right.  Four are in the last row -- one in the rear left, two in the rear center, one in the rear right.

As in a typical auditorium, the level of the floor slopes from the rear toward the front of the stage.  Specifically, the floor begins to slope downward after the rear row of seats, and the slope continues evenly ending just before front row of seats.  In the well are two sets of steps leading from the well to the stage, one on the left side of the stage and one on the right.  At the far right of the well is a platform lift leading between the well level and the stage level.[7]

There is no dispute that the four aisles are the primary paths for non-disabled people using the auditorium seating.  There is also no dispute that the aisles are not "accessible routes" for people with mobility disabilities, primarily because the aisles exceed the slope limitations for accessible ramps.  LaBrake Dec. ¶ 42; Marinelli Dec. ¶¶ 35-39.[8]  The design of not using the aisles as accessible routes is intentional, and the

---

[7]The District maintains that both the lift and the steps leading from the well to the stage are behind floor-to-ceiling walls, and are therefore not visible to persons seated in the auditorium.  LaBrake Dec. ¶ 55.

[8]"As shown in the notations, the floor slopes a total of 4'2" over the course of 39 feet from back to front.  Accomplishing such a drop requires 1:9 slope ration (or 11.1% grade); this exceeds the maximum slope of an ADA-accessible route of 1:12 (or 8.33% grade) . . . ."  LaBrake Dec. ¶ 42 (citing 2010 ADA Standards § 405).  Neither party disputed this measurement at oral argument.  N.T. 04/08/21 at 4-5.  The aisles also do not have landings, which must be used with ramps exceeding a rise in elevation of 30 inches.  Marinelli Dec. ¶ 36 (citing 2010 ADA Standards §§ 405.6, 405.7).

District contends that it is permissible to maintain the necessary line of sight for all viewers from the seats to the stage. LaBrake Dec. ¶ 42.

According to the District, the accessible path for a student using a wheelchair to reach the rear seats is through the rear entrance doors, and the accessible path for a student using a wheelchair to reach the front seats is to enter through the right stage entrance door, follow the corridor along the stage, and then use the lift to descend to the well level. LaBrake Dec. ¶¶ 53-54; Hersh Dec. ¶¶ 46-47. While Defendant's witness declarations are silent on an accessible path to get from the rear of the auditorium to the front or stage area, the diagram explicitly illustrates that the proposed accessible path uses the hallways outside the auditorium. That is, to gain access to the stage from the rear seats, a student using a wheelchair must exit the rear of the auditorium, turn left, turn left at the next hallway, turn left at the end of the long hallway, turn left to enter the right stage entrance door, and then proceed to the stage.[9] If that same student wanted to reach the front row or well, the student would use the lift to descend. Plaintiff's expert estimated from the diagram that a non-disabled student seated at the rear of the auditorium would travel approximately 85 feet to reach the stage, whereas a student using a wheelchair would travel approximately 200 feet to travel the described path. Marinelli Dec. ¶ 45.[10]

---

[9]The appended diagram marks out this route with arrowed lines and the notations "accessible route from back of auditorium to stage" and "accessible route from front of auditorium to stage," which were added in red to the exhibit attached to Ms. LeBrake's declaration. LeBrake Dec. ¶ 39 & at Exh. 2.

[10]The District did not "double check those measurements," N.T. 04/08/21 at 5, but did not dispute that they are roughly accurate. The diagram does not contain sufficient details to calculate specific distances, but does make clear that the distance is more than

## B.    Communications Regarding the New Middle School

The parties dispute whether Plaintiff raised a timely objection to the District's plans for the auditorium, and therefore I will review the parties' post-Consent Decree communications in some detail.  The communications described below were all through the parties' attorneys, and illustrate that the District's planned accessible paths were not immediately apparent to Plaintiff.

Consistent with the Consent Decree, on August 9, 2019, the District sent S.F. an email that contained an internet link to thirteen files containing its plans for the New Middle School.  Doc. 65-5; <u>N.T.</u> 04/08/21 at 6.  The linked files have not been provided to the court, but it is not disputed that the drawings accompanying the August 9th materials did not mark the proposed accessible routes in the auditorium.[11]

On October 29, 2019,[12] Plaintiff sent Defendant an email attaching a spreadsheet from his accessibility expert, Dominic Marinelli, identifying 117 aspects of the drawings

---

two times greater and involves leaving the auditorium and traversing portions of three hallways.

[11]The District contends that the Consent Decree did not require it to identify the accessible route.  <u>See</u> <u>N.T.</u> 04/08/21 at 7.  The Consent Decree required the District to provide construction plans "sufficient for Plaintiff to determine whether the New Middle School meets the terms of the Consent Decree," Consent Decree ¶ 3(b), and the parties dispute whether it could be determined from the drawings that the slope of the aisles exceeded that permissible for them to be accessible.  <u>N.T.</u> 04/08/21 at 7, 8-9.

[12]Plaintiff concedes that his submission was outside the thirty-day period set forth in the Consent Decree, <u>see</u> Consent Decree ¶ 3(b), but contends that there were technical difficulties in accessing the online materials linked to the District's August 9, 2019 email. <u>See</u> Doc. 68 at 46-47 (with exhibit citations).  The District concedes that it also took longer than the thirty days specified in the same subparagraph of the Consent Decree in which to respond to Plaintiff's submission.  Doc. 65-1 at 6 n.5.

(not just the auditorium) that required clarification to ensure accessibility and compliance with the 2010 ADA Standards. See Doc. 65-6 ("Marinelli Report"); Marinelli Dec. ¶¶ 24-25.[13] On January 19, 2020, the District responded to the Marinelli Report, attaching a memorandum by Ms. LaBrake that reprinted Mr. Marinelli's itemized spreadsheet and set forth itemized responses to each of the 117 contested aspects of the design in a table format. Docs. 63-7 & 65-9 ("LaBrake Response"). Ms. LaBrake as well as the District's other architectural and engineering experts who had participated in planning the New Middle School, Mr. Hersh and Mr. Fazil, also participated in preparing the response. See LaBrake Dec. ¶¶ 32-35; Hersh Dec. ¶27; Fazil Dec. ¶ 32.[14]

The relevant entries in the Marinelli Report concerning the auditorium are identified as Issues 40 and Issue 88. As to the accessible route issue identified in Issue 40, Mr. Marinelli noted:

---

[13]Mr. Marinelli has been "providing consulting services devoted to making our built environment accessible to people with disabilities" for more than 30 years, assisting "property owners and designers navigate the accessibility requirements in design and construction that apply to any given building, both at the state and federal level." Marinelli Dec. ¶ 1.

[14]Kimberly LaBrake has "been a registered, licensed architect since 2005, with a focus primarily in designing public schools, municipal buildings . . . , and healthcare renovation projects . . . ." LaBrake Dec. ¶ 2. Ms. LaBrake works for D'Huy Engineering, the firm engaged by the District to manage the planning, approvals, design, and construction of the New Middle School, and was assigned to assess it accessibility. Id. ¶¶ 21-22. Daniel Hersh is also a licensed architect of longstanding who works for Breslin Ridyard Fadero Architects, the firm retained by the District to prepare the construction documents for the New Middle School, and is the project architect. Hersh Dec. ¶¶ 1, 5, 22-23. M. Arif Fazil is a licensed Professional Engineer and President of D'Huy Engineering, with 33 years of experience in planning, design, and implementation of public school facilities. Fazil Dec. ¶¶ 1-4, 16.

Depict intended slope at aisles between seating.  Assumes 5% maximum.

Doc. 65-6 at 6.  In Response T to Issue 40, the LaBrake Response indicated:

The aisles between the seating . . . are not an accessible route. The slope is approximately 10%.  A wheelchair lift has been provided to provide access [to] the low end of the auditorium.

Doc. 65-9 at 13.

As to the stage lift identified in Issue 88, Mr. Marinelli noted:

Confirm platform lift is not intended along the accessible route and only used a limited and specific locations.

Doc. 65-6 at 9.  In Response OO to Issue 88, the LaBrake Response stated:

The platform lift is part of an accessible route allowing a person in a wheelchair to access the pit area of the auditorium from the stage.  The lift is in the same area as the general circulation path and is in the same area as the steps leading from the stage to the lower auditorium area (pit).

Doc. 65-9 at 14-15; see also N.T. 04/08/21 at 9.

The parties then engaged in lengthy back and forth, ultimately reaching agreement on most aspects of the design, but not the auditorium wheelchair accessibility issues that give rise to the present motion, debate over which lasted the remainder of 2020.[15]  For example, in an email on February 10, 2020, Plaintiff stated, "[i]t appears that, in large part, we are in agreement on the substance and it is just a matter of documentation.  In some cases, additional information needs to be provided."  Doc. 65-10.  The attachment noted

_____

[15]In his reply, Plaintiff includes what appears to be a complete chronological summary of each correspondence between the parties between August 9, 2019, and December 1, 2020, with exhibit citations.  See Doc. 68 at 38-54.  The court will not include each correspondence in its summary.

that Issue 40 remained open and that "we need an accessible route." Id. at 8. As to Issue

88, Plaintiff noted "Since used in limited application, will comply," and marked this issue

"Closed." Id. at 12.[16]

In its response emailed on February 29, 2020, the District updated its Response T

addressing Issue 40, stating:

> This response assumes that the review comment is with
> regards to ADA Standard 221.2.3.2 Vertical Dispersion.[17]
> This standard requires that wheelchair spaces be located at
> varying distances from the performing area. The accessible
> seating locations in this Auditorium are located along an
> accessible route at the front and rear of the Auditorium, and
> therefore, are at varying distances from the stage. . . . By
> having accessible seating at the front and rear of the
> Auditorium the locations are vertically dispersed and comply
> with the ADA Standard.

Doc. 65-11 at 16-17. This response did not make specific reference to the accessible route

from the rear seating area to the stage.

On April 9, 2020, Plaintiff emailed an updated report from Mr. Marinelli indicating

as follows regarding Issue 40:

> No direct route from grade has been provided to lower level
> seating. Accessible route as designed relies on a lift. Lift
> cannot be part of an accessible route. Exception at stage areas
> is intended to get from the seating to the stage, not the other

---

[16]Plaintiff explained at oral argument that the District's stated purpose of the lift in
the LaBrake Response was permissible because it was limited to a student in a wheelchair
reaching the stage once seated in the front row, see N.T. 04/08/21 at 22, 24-25, but that the
District's broader purpose to use the lift as the accessible route by which people in
wheelchairs would access the seating at the front of the auditorium was not made clear and
is not permissible. Id. at 22-23, 25.

[17]The 2010 ADA Standards impose line of sight and dispersion requirements for
wheelchair accessible seating in assembly areas. 2010 ADA Standards § 221.2.3.

> way around. With 467 seats, accessible seating needs to be
> dispersed in new construction at top middle and bottom at a
> minimum. Accessible route needs to be provided to all three
> locations.

Doc. 65-12 at 11.[18] Plaintiff emphasized that Mr. Marinelli needed the full set of

drawings and related specifications and addenda that would be provided to the contractor

for construction. Id. at 2.

Following several exchanges evidencing optimism that remaining issues could be

resolved, the District emailed Plaintiff on May 19, 2020, stating in part:

> It looks like there are two areas on which genuine
> disagreement remains regarding what the ADA Standards
> require, as reflected by Comments T and QQ. I do not think
> these disagreements are intractable; rather, there needs to be
> further discussion of what the ADA Standards actually provide
> on those specific topics.

Doc. 65-13 at 2.[19]

On May 29, 2020, Plaintiff's attorney sent an email again expressing "that there do

not appear to be many areas of genuine disagreement," and stating that "we are having

trouble getting the required notes included in the construction documents." Doc. 68-12 at

2. As to Comment T, Plaintiff needed

---

[18]The District responded that the ADA Standards do not require seating in the middle section of the auditorium, Doc. 65-15 at 5, and Plaintiff no longer asserts any objection based on dispersion of the accessible seats.

[19]Item QQ related to the guidance services counter, which is not at issue. The District's email did not highlight item OO, which the District believed to be closed. Doc. 65-13 at 10.

> to get from the architect some additional details that explain
> why the architect thinks it complies. The lift does not provide
> an accessible route into the auditorium.

Id. at 3.

The District replied by email on June 15, 2020, with another link, and stating in

part:

> As concerns the accessible path, there is no need to use a
> wheelchair lift to access the rear seats. The accessible path to
> the front seats does require the use of a wheelchair lift;
> however, that is permitted by Section 206.7.2 of the Standards
> . . . .

Doc. 65-15 at 6.

Plaintiff emailed in response on July 1, 2020, and as to item T, stated:

> I think there is some confusion. The issue is that there is no
> accessible route to the accessible seats in the front row. The
> slope exceeds the maximum allowable slope of 8.33%.
> Therefore, the auditorium will need to be designed to correct
> the excess slope so that a person in a wheelchair can access the
> front row of accessible seats. Please provide drawings that
> reflect compliance.

Doc. 68-13 at 4.[20] In the attached issue list, Plaintiff's expert noted as to item 40:

> [A]ccessible route has not been provided coinciding with or in
> the [same] general area as the general circulation path.

---

[20]The District's position is that during the course of this correspondence, it had
clearly stated that the auditorium's accessible routes were to the front and to the back of
the wheelchair seating areas, and not through the middle of the room, and that since its
first response in January 2020, it was clear that the center aisles of the Auditorium were
not intended to be accessible routes, and that those routes would be located elsewhere.
However, as Plaintiff points out, see Doc. 68 at 51 n.29, although the District said where
the accessible routes would not be located, it did not explain where the accessible route
would be located.

Approximate slope is depicted at 10% along the 4 ramps . . . .
These paths do not comply.

Id. at 15.[21]

In its email on August 2, 2020, the District responded:

> The accessible path for the front-row wheelchair-accessible
> seats in the auditorium is through the side entrance onto the
> stage.[22]  Anyone who wishes to use the front row-wheelchair-
> accessible seats who does not want to enter through the back of
> the auditorium and use the center aisle due to its slope may
> enter through the side entrance at stage level and then use the
> wheelchair lift at the front of the stage to get down to the level
> of the first row.
>
> The most recent response from Plaintiff's consultants contends
> that there is not a route "coinciding with or in the [same]
> general area as the general circulation path."  Although the
> author of this comment does not cite a particular ADA
> Standards section to which this relates, we believe it is
> intended to refer to 206.3.  Assuming this is correct, we
> disagree with any opinion that the existing design fails to
> comply with Section 206.3.  The accessible path for the
> wheelchair-accessible seats at the front of the auditorium is in
> the general area of the general circulation path for the
> auditorium.  The fact that it uses a different entrance to the
> same room does not place it outside of the general area of the
> general circulation path, as it does not require anyone to go
> outside the building, does not require passing through multiple
> other doors that may be locked, etc.  The District's architects
> would be comfortable testifying to this opinion as being a
> prevailing interpretation of these requirements within the
> professional design industry.

_____

[21]"Circulation Path" is defined as a "way of passage provided for pedestrian travel."
2010 ADA Standards § 106.5.  "Accessible routes shall coincide with or be located in the
same area as general circulation paths."  Id. § 206.3.

[22]I interpret the "side entrance" referenced by the District to be what I have called
the right stage entrance on the appended drawing.  Such an interpretation is consistent with
the referenced entrance being "at stage level," as stated in the same August 2, 2020 email.

Doc. 65-17 at 2.  The District did not explicitly mark the location of the accessible route,

id.; N.T. 04/08/21 at 12-13, although it contends that the location of the accessible route

was "pretty obvious."  N.T. 04/18/21 at 15-16.

On August 6, 2020, Plaintiff reiterated his position that

> the route to access the accessible seats in the front row and the
> route to access the stage from the accessible seats in the back
> do not comply with Section 206.3 because the slope of the
> aisle(s) in the general path of circulation, meaning the path
> used by non-disabled people, is too steep.

Doc. 65-18 at 2.  Counsel for the District did not respond until November 5, 2020,

suggesting a time frame for counsel to confer.  See Doc. 68-14 at 3-5.

Counsel conferred on the auditorium issues on November 13, 2020, see Doc. 68-15,

and on November 30, 2020, following additional e-mail exchanges, the District's counsel

informed Plaintiff's counsel that he did not "think either side is going to convince the

other" and advised that if Plaintiff wants "a definitive resolution of this issue, I think you

will have to go to the Court."  Doc. 68-16 at 3.  On December 1, 2020, Plaintiff's counsel

agreed that the parties "simply disagree on this one and that court intervention is necessary

to resolve the issue."  Id. at 2.[23]

---

[23]The above communications did not reference the ongoing construction of the New
Middle School.  According to the District, construction began in September 2019 as
scheduled, and continued through 2020 except for a six-week period from late March
through April 2020 when most activities were halted due to the Covid-19 coronavirus
pandemic.  See Fazil Dec. ¶¶ 28, 37.  The construction of the new building portion of the
New Middle School has a budget of approximately $60 million.  Id. ¶ 40.  The parties
dispute whether S.F.'s parents were on notice of the ongoing construction.

On December 21, 2020, Plaintiff filed the present motion to enforce the Consent Decree, Doc. 62, arguing that that Defendant's proposed design for the auditorium violates federal law by denying "full and equal access for students, teachers, parents and community members with mobility disabilities to events like plats, concerts, assemblies and awards ceremonies." Doc. 63 at 1-2. Defendant filed a brief in opposition, arguing in the alternative that Plaintiff's motion should be dismissed as moot, barred by the doctrine of laches, and denied on the merits, and asserting a counter-motion to modify the Consent Decree by striking paragraph three in its entirety. Doc. 65-1. Plaintiff then filed a reply brief in support of its motion and in opposition to Defendant's cross-motion. Doc. 68. On April 8, 2021, I held remote oral argument on Plaintiff's motion and Defendant's cross-motion. N.T. 04/08/21 (Doc. 73). The matter is ripe for disposition.

## II.    LEGAL STANDARDS

### A.    Consent Decrees

In order to discern the scope of a consent decree, courts examine "the language within its four corners," and "as consent decrees have many of the attributes of contracts, we interpret them with reference to traditional principles of contract interpretation." United States v. New Jersey, 194 F.3d 426, 430 (3d Cir. 1999); see also McDowell v. Phila. Housing Auth., 423 F.3d 233, 238 (3d Cir. 2005) (contract principles generally govern construction of a consent decree issued upon agreement of the parties, and courts should enforce unambiguous agreements according to their plain terms). In doing so, an interpretation that "gives reasonable meaning to all of the contract's provisions is preferred to one which leaves a portion of the writing useless or inexplicable." Pennbarr Corp. v.

Ins. Co. of N. Am., 976 F.2d 145, 141 (3d Cir. 1992) (internal quotations omitted). A court "may not make a different or better contract than the parties themselves saw fit to enter into." Id.

It is well settled that a court has the inherent power to enforce a consent decree in response to a party's non-compliance, and to modify a decree in response to changed conditions. See Holland v. N.J. Dep't of Corr., 246 F.3d 267, 270 (3d Cir. 2001) (citing Spallone v. United States, 493 U.S. 265, 267 (1990) (courts have inherent power to enforce compliance with their consent decrees); United States v. United Shoe Mach. Corp., 391 U.S. 244, 248 (1968) (courts have inherent power to modify a consent decree upon an appropriate showing)). Modifications of consent decrees are permitted when "a significant change in facts or law warrants their amendment." Frew ex rel. Frew v. Hawkins, 540 U.S. 431, 441 (2004) (citing Rufo v. Inmates of Suffolk County Jail, 502 U.S. 367, 393 (1992)). When the defendant seeks to modify a consent decree, it must show "'a significant change either in factual conditions or in law.'" Holland, 246 F.3d at 284 n.16 (quoting Rufo, 502 U.S. at 384-85).

### B. Regulatory Interpretation

Congress enacted the ADA in 1990 to remedy widespread discrimination against disabled individuals. PGA Tour, Inc. v. Martin, 532 U.S. 661, 674–75 (2001). Pursuant to this purpose, the ADA is defined by its broad character. Id. at 675; see also Disabled in Action of PA v. Transp. Auth., 539 F.3d 199, 208-09 (3d Cir. 2008) ("[The ADA] as a remedial statute, designed to eliminate discrimination against the disabled in all facets of society, . . . must be broadly construed to effectuate its purpose."). Thus, ambiguities in

the ADA are resolved by granting deference to the party alleging discrimination to keep with the ADA's rationale to provide clear "enforceable standards" addressing such discrimination.  See Ford v. Schering-Plough Corp., 145 F.3d 601, 608 (3d. Cir. 1998).

The present motion involves interpretation of the 2010 ADS Standards, issued by the Department of Justice ("DOJ").  In interpreting these regulations, principles of statutory interpretation apply.  See Kisor v. Wilkie, ___ U.S. ___, 139 S. Ct. 2400, 2415 (2019).  If the Court can determine an unambiguous meaning of a regulation by reviewing its text, structure, history, and purpose, then the Court must apply the regulation without further resort to other means of construction.  As the Supreme Court has emphasized, if a regulation is not ambiguous, then it "just means what it means – and the court must give it effect, as the court would any law."  Id. at 2416-17.[24]  Moreover, "before concluding that a rule is genuinely ambiguous, a court must exhaust all the 'traditional tools' of construction."  Id. at 2415 (citing Chevron U.S.A. v. Nat. Res. Def. Council, Inc., 467 U.S. 837, 843 n.9 (1984) (adopting same approach for agency interpretation of ambiguous statutes)).

Neither the DOJ nor any other federal agency polices compliance with the 2010 ADA Standards, leaving that role to the courts.  The parties' consultants have expressed

---

[24]Although Kisor involved an agency that interpreted and applied its own regulations, to which a deferential standard applies, the Supreme Court made clear that these principles of statutory interpretation apply where, as here, the court is not confronted with an agency's interpretation of its own regulations.  See 139 S. Ct. at 2415 ("To make that effort [of determining whether a regulation is ambiguous], a court must 'carefully consider[]' the text, structure, history, and purpose of a regulation, *in all the ways it would if it had no agency to fall back on*.") (citation omitted) (emphasis added).

opinions as to whether the District's design complies with the 2010 ADA Standards. However, the court cannot defer to such opinions, nor can it rely on the approval of local or state code officials who are not empowered to interpret the 2010 ADA Standards. Although case law offers little guidance in interpreting the specific regulations at issue here, several courts have held that interpretation of the ADA's accessibility standards are legal questions for the court to decide. See, e.g., Steelman v. City of Salem, 2013 WL 1363792, at *6 n.4 (E.D. Mo. Apr. 4, 2013) (interpretation of 1991 ADA Accessibility Guidelines ("ADAAG"), the predecessor of the 2010 ADA Standards, is a matter of law); Small v. Dellis, 1997 WL 853515, at *4 n.5 (D. Md. Dec. 18, 1997) (expert could opine on factual matters related to ADAAG, but "the question of interpretation posed by [ADAAG] are legal questions within the competence of the court to resolve. . . ."). This proposition is consistent with the broader principle that experts may testify as to facts, but not as to law. See, e.g., United States v. Leo, 941 F.2d 181, 195-96 (3d Cir. 1991) ("An expert witness is prohibited from rendering a legal opinion."); In re Tylenol (Acetaminophen) Mktg., Sales Practices & Prods. Liab. Litig., No. 13-02436, 2016 WL 4039324, at *3 (E.D. Pa. July 27, 2016) (court "'must ensure that an expert does not testify as to the governing law'") (quoting Berckeley Inv. Grp. v. Colkitt, 455 F.3d 195, 217 (3d Cir. 2006)); Orner v. Nat'l Beef Packaging Co., LLC, No. 4:13-CV-0837, 2015 WL 8334544, at *9 (M.D. Pa. Dec. 9, 2015) (experts may testify as to facts, but cannot testify regarding a duty the ADA imposes upon employers or owners of places of public accommodation subject to the ADA).

## III.   DISCUSSION

### A.   The Motion to Enforce the Consent Decree is Proper

Defendant asserts three barriers to the court's consideration of the Plaintiff's motion; mootness, laches, and modification of the Consent Decree to eliminate paragraph three.

#### 1.   Mootness

Defendant argues that Plaintiff's motion to enforce the consent decree is moot because the school will not be completed until Plaintiff is in ninth grade and he will therefore never be a student at the New Middle School.  Doc. 65-1 at 3-4; N.T. 04/08/21 at 29-30.  Plaintiff disputes that the motion is moot.  Doc. 68 at 30-35.

"A case is moot when the issues presented are no longer 'live' or the parties lack a legally cognizable interest in the outcome."  Donovan ex rel. Donovan v. Punxsutawney Area Sch. Bd., 336 F.3d 211, 216 (3d Cir. 2003) (internal brackets omitted) (quoting Powell v. McCormack, 395 U.S. 486, 496 (1969)).  "If developments occur during the course of adjudication that eliminate a plaintiff's personal stake in the outcome of a suit or prevent a court from being able to grant the requested relief, the case must be dismissed as moot."  Id. (internal brackets omitted) (quoting Blanciak v. Allegheny Ludlum Corp. 77 F.3d 690, 698–699 (3d Cir.1996)).  The burden of establishing mootness is "heavy," "even 'formidable.'"  DeJohn v. Temple Univ., 537 F.3d 301, 309 (3d Cir. 2008) (quoting Los Angeles v. Davis, 440 U.S. 625, 631 (1979); United States v. Virgin Islands, 363 F.3d 276, 285 (3d Cir. 2004)).  A request to compel enforcement of a consent decree, like other claims, can become moot if "'(1) the alleged violation has ceased, and there is no

reasonable expectation that it will recur, and (2) interim relief or events have completely and irrevocably eradicated the effects of the alleged violation.'" Del. Dep't of Nat. Res. & Env. Control v. U.S. Envtl Prot'n Agency, 746 F. App'x at 131, 133 (3d Cir. 2018) (not precedential) (quoting Finberg v. Sullivan, 658 F.2d 93, 97-98 (3d Cir. 1980) (en banc)).

Defendant relies primarily on Donovan. Doc. 65-1 at 20-22. In Donovan the plaintiff alleged that the school district interfered with her First Amendment religious rights by refusing to allow her to hold a Bible club meeting during the school's morning activity period, and the Third Circuit held that the student's graduation from high school during the pendency of the litigation mooted her claim for injunctive relief. 336 F.3d at 213. The court explained that plaintiff's graduation meant that the alleged harm of which she complained bore no possibility of repetition, and therefore her requests for injunctive and declaratory relief no longer presented a live controversy. Id. at 216. In doing so the court listed several cases similarly concluding that a student's challenge to a school's conduct or policy moots a claim for injunctive or declaratory relief upon graduation. Id. (citing, inter alia, Bd. of Sch. Comm'rs v. Jacobs, 420 U.S. 128, 129 (1975) (per curiam) (in suit by six plaintiffs to declare certain school regulations unconstitutional, once "all of the named plaintiffs in the action had graduated . . . a case or controversy no longer exists")). Because S.F. will have graduated from middle school by the time the New Middle School is completed, Defendant argues that Plaintiff's request for injunctive relief is not a live controversy and must by dismissed as moot.

However, Donovan and the cases it relied on all involved claims of constitutional violations and not, as here, a claim of a violation of a consent decree reached upon the

agreement of the parties and entered by the court.  The question here is not whether Plaintiff's underlying suit regarding accessibility is moot, but whether Plaintiff's motion to enforce his rights under the mutually negotiated Consent Decree is moot.  Such a matter only becomes moot if it is beyond dispute that defendant fully complied with its contractual obligations.  See, e.g., Davis, 440 U.S. at 633-34 (defendants' compliance with the terms of a consent decree was sufficient to moot its enforcement); cf. Ketzner v. John Hancock Mut. Life Ins. Co., 118 F. App'x 594, 601-02 (3d Cir. 2004) (payment of benefits on disability claim was sufficient to moot breach of contract claims).  That cannot be said here where Plaintiff's rights are not contingent on his attendance of the middle school.  The Consent Decree by its terms remains in effect because Plaintiff has not yet completed middle school.  Consent Decree ¶ 47.  As a result, this action is not moot.

Defendant's argument that the matter is moot is belied by other express language of the Consent Decree.  As quoted above, the parties stated in the Consent Decree that the New Middle School "is scheduled to be completed for the 2022-23 school year," Consent Decree ¶ 3(a), meaning that at the time the parties entered into the Consent Decree, it was already known that S.F. would most likely be in ninth grade by the time the New Middle School would be ready for occupancy.  Nevertheless, the District agreed that it would "construct the New Middle School so that it is accessible to and usable by S.F. [and] ensure that the New Middle School fully complies with the [2010 ADA Standards]."  Id. In other words, the fact that the District is now certain that the New Middle School cannot be completed until the 2022-23 school year does not affect the express terms of the Consent Decree.

For these reasons, I find that the motion to enforce the consent decree is not moot.

### 2. Laches

Defendant also argues that Plaintiff's motion is improper by operation of the doctrine of laches because Plaintiff had Defendant's architectural plans for over a year before filing the present motion, <u>see</u> Doc. 65-1 at 2, 4-11, and because Plaintiff did not assert its objections to the District's plans within thirty days as required by the Consent Decree. <u>N.T.</u> 04/08/231 at 28-29. Plaintiff argues in response that the doctrine of laches is not applicable because he filed his motion within the statute of limitations and because Defendant did not come to the court with clean hands and has not shown that any delay was inexcusable and resulted in prejudice. Doc. 68 at 36-51.

A consent decree is, essentially, "a settlement that contains an injunction." <u>In re Masters Mates & Pilots Pension Plan & IRAP Litig.</u>, 957 F.2d 1020, 1025 (2d Cir. 1992). "[E]nforcement of a consent decree . . . is subject to the Court's inherent power under principles of equity. . . [and is] 'therefore subject to the usual equitable defenses.'" <u>Montalvan v. Neville's Mobile Home Court, LLC</u>, No. 3:11-CV-850, 2020 WL 3172758, at *12 (M.D. Pa. June 15, 2020) (citing <u>Virgin Islands</u>, 363 F.3d at 290, and quoting <u>Cook v. City of Chicago</u>, 192 F.3d 693, 695 (7th Cir. 1999)). Laches is one such equitable defense.

"Laches consists of two elements: (1) inexcusable delay in bringing suit, and (2) prejudice to the defendant as a result of the delay." <u>Lontex Corp. v. Nike, Inc.</u>, No. 18-5623, 2021 WL 724971, at *4 (E.D. Pa. Feb. 24, 2021) (quoting <u>Santana Prods. v. Bobrick Washroom Equip., Inc.</u> 401 F.3d 123, 138 (3d Cir. 2005)). "To establish an inexcusable

delay, the defendant must show that the plaintiff sat on his rights." Beattie v. Line

Mountain Sch. Distr., 992 F. Supp.2d 384, 396 (M.D. Pa. 2014) (citing In re Mushroom

Transp. Co., 382 F.3d 325, 343-43 (3d Cir. 2004)). As for the prejudice prong, Judge

Baylson of this court recently stated:

> There are two types of prejudice a defendant might
> suffer. "Evidentiary prejudice occurs when, by reason of the
> delay, a defendant is unable to present a full and fair defense
> on the merits due to the loss of records, the death of a witness,
> or the unreliability of memories." Heraeus Electro-Nite Co. v.
> Midwest Instrument Co., No. 06-355, 2007 WL 2071905, at *4
> (E.D. Pa. July 17, 2007) (Padova, J.). "Economic prejudice
> occurs when a defendant suffers the loss of monetary
> investments or incurs damages which would have been
> prevented if the [plaintiff] brought suit earlier." Id. In finding
> economic prejudice, the court does "not merely consider those
> losses attributable to a finding of liability . . ., but must look
> for a change in the defendant's economic position during the
> period of delay." Id.

Lontex Corp., 2021 WL 724971, at *5.

The Consent Decree does not contain a time limitation on when Plaintiff can seek

enforcement with respect to the New Middle School. As Plaintiff points out, see Doc. 68

at 36, the doctrine of laches is presumptively inapplicable if an action is commenced

within the statute of limitations. Degussa Constr. Chem. Oper., Inc. v. Berwind Corp., 280

F.Supp.2d 393, 411 (E.D. Pa. 2003) (citing Mantilla v. United States, 302 F.3d 182, 186

(3d Cir. 2002); see also Santana Prods., 401 F.3d at 138 ("Once the statute of limitations

has expired, the defendant enjoys the benefit of a presumption of inexcusable delay and

prejudice."). Here, the most analogous limitations period for a legal action is

Pennsylvania's four-year statute of limitations for contract actions, 42 Pa. C.S.A.

§ 5525(a)(1), which also applies to "[a]n action upon a judgment or decree of any court of

the United States or of any state." Id. § 5525(a)(5). Because Plaintiff clearly filed this motion within the four-year statute of limitations, laches is presumptively inapplicable, and the presumption can be overcome by a showing that Plaintiff's delay in commencing this action was inexcusable and resulted in prejudice.

To decide if Plaintiff improperly delayed bringing the present action, I look to whether the parties' communications between August 2019 and November 2020 evidence intentional delay or misrepresentations on Plaintiff's part. These communications were summarized previously. Supra at 7-14. Initially I observe that the District provided plans to Plaintiff on August 19, 2019, as called for by the Consent Decree, but that Plaintiff did not respond with any objections to the plans until October 29, outside 30 days as contemplated. Consent Decree ¶ 3(b).[25] However, I conclude that Plaintiff's failure to respond in time is not a barrier to Plaintiff's motion. Apart from issues Plaintiff raises with difficulty in accessing the link containing the plans, the District was required to provide plans "sufficient for Plaintiff to determine whether the New Middle School meets the terms of this Consent Decree," id., and it is clear from the parties' communications that the proposed accessible paths in the auditorium were not clear from the initial plans.

The plans for the new building were complex, and although Plaintiff's current objection was not fully clarified for some time, Plaintiff did identify auditorium access issues from the outset. In its October 2019 response, Plaintiff inquired about an accessible route both as to the slope in the aisles and the purpose of the wheelchair lift. In its January

_____

[25]The District similarly waited more than 30 days to respond to Plaintiff's initial list of comments, also outside the time contemplated. Consent Decree ¶ 3(b).

2020 response, the District indicated that the "aisles are not on an accessible route" because the slope was approximately 10%, and that the "wheelchair lift has been provided to provide access [to] the low end of the auditorium." Plaintiff's response in February as to the seating area was that "we need an accessible route," indicating that Plaintiff either did not understand where the District intended to place the accessible route to reach the front wheelchair seats, or believed the intended route did not comply.

The parties' communications throughout the following months make clear that they were attempting to reach mutual understanding and agreement on this (as well as other) issues. To some degree, it appears that the parties were talking past each other, as they each made the same point on several occasions, and it was not until about August that their differences began to crystalize. What is clear is that Plaintiff never acquiesced in the District's plans to use the lift as an accessible route to reach the lower seating area or to use the corridors as the accessible route to reach the front row seats or stage, and that the issues did not ripen into an intractable dispute until November 30, 2020, when the District advised Plaintiff to "go to the court" for a "definitive resolution." Plaintiff filed the motion on December 21.

On this record I do not find that Plaintiff exhibited inexcusable delay. Had the District illustrated the intended paths more clearly perhaps the parties would have identified their stalemate earlier. The intended paths were easily illustrated for the court by the simple solution of notating them on the appended diagram, something the District did not do at any prior point. N.T. 04/08/21 at 12. In any event, the parties worked in

good faith to come to a mutual understanding and did so with respect to the vast majority of their differences, and Plaintiff did not unreasonably delay his objection.

As for prejudice, Defendant is in an even weaker position. The District does not assert any evidentiary prejudice, and in any event the determination of the Auditorium's compliance with the 2010 ADA Standards is a legal one, informed by materials which remain available. As to economic prejudice, the District's invocation of laches also fails. The Consent Decree specifically anticipated that negotiations concerning accessibility of the New Middle School might be ongoing after construction began and that it could impact construction, as the Consent Decree expressly provides that "Defendant shall not be entitled to claim that a modification cannot be made because the modification will interfere with or delay the construction schedule." Consent Decree ¶ 3(b). It is also worth noting that the District did not raise any concern during the parties' lengthy communications that the delay would impact the ongoing construction.

Additionally, Plaintiff argues that Defendant is not entitled to the benefit of the doctrine of laches because it makes its arguments with "unclean hands." As with undue delay, a determination of "unclean hands" turns on the extent of the delays and intentional misrepresentations made by the District in the parties' lengthy communications. The parties actively communicated regarding progress on the plans for the New Middle School, but simply could not overcome their differences regarding auditorium accessibility issues. Under the circumstances, a finding of "unclean hands" is not warranted, and I do not rely on wrongdoing by the District in finding that laches does not bar Plaintiff's motion.

### 3.    Modification of Consent Decree

In its brief opposing Plaintiff's motion, the District presents a cross-motion asking the court to modify the Consent Degree by deleting paragraph three relating to the New Middle School, which would eliminate the basis for Plaintiff's motion.  Doc. 65-1 at 34-36.  Plaintiff maintains that the District has offered no valid justification for modification. Doc. 68 at 51-54.

As previously noted, the court has the inherent power to modify a consent decree in response to "a significant change either in factual conditions or in law."  Holland, 246 F.3d at 284 n.16.  Defendant argues that there is a changed condition here that warrants modification of the Consent Decree -- namely, that it is now certain that the New Middle School will not be completed until after S.F. is no longer a middle school student.

As discussed above in the context of mootness, Defendant's reliance on this alleged "new" fact is misplaced because the Consent Decree expressly provides that the New Middle School "is scheduled to be completed for the 2022-23 school year," and therefore the District already knew that S.F. would likely no longer be attending middle school when the new building was completed.  Consent Decree ¶ 3(a); N.T. 04/08/21 at 95-96. Nevertheless, the District agreed to "construct the New Middle School so that it is accessible to and usable by S.F."  Id.  Given the express language of the Consent Decree, confirmation that S.F. will not be a middle school student in the New Middle School does not constitute a "changed condition."  As such, Defendant is not entitled to have paragraph three stricken from the Consent Decree.

**B.    Merits of the Motion**

Having found the motion to enforce to be procedurally proper, I will now address

the merits.  As previously noted, the Consent Decree requires the District to comply with

the 2010 ADA Standards (hereinafter "Standards") in constructing the New Middle

School.  Consent Decree ¶ 3(a).  This is consistent with applicable regulations, which

provide that new construction of local government facilities commenced on or after March

15, 2012, must comply with the Standards to meet the accessibility requirements of Title II

of the ADA.  See 28 C.F.R. § 35.151(c)(3).[26]  The Standards require state and local

governments to comply with both 28 C.F.R. § 35.151 and the 2004 ADA Accessibility

Guidelines ("ADAAG") promulgated by the United States Access Board ("Access

Board").  See Standards Introduction.

Pursuant to the Standards, "[a]ccessible routes shall be provided in accordance with

[section] 206 and shall comply with Chapter 4."  Standards § 206.1.  Both section 206 and

Chapter 4 are entitled "Accessible Routes."  Section 206 identifies where accessible routes

are required to be placed as well as when platform lifts can be used as part of an accessible

route.  Id. §§ 206.2, 206.3, 206.7.  Chapter 4 details the technical standards for accessible

routes, including the maximum running slope for ramps and walkways, when landings for

ramps must be installed and how they must be designed, and how platform lifts are to

---

[26]Congress directed the Attorney General to issue regulations to carry out the
accessibility provisions of the ADA, 42 U.S.C. § 12186(b), pursuant to which the DOJ
adopted the Standards.  As noted, the relevant Standards are attached to Plaintiff's motion.
Doc. 63-5.  The complete document can be found at
https://www.ada.gov/regs2010/2010ADAStandards/2010ADAstandards.htm.

installed.  E.g., id. §§ 401.1 ("[t]he provisions of Chapter 4 shall apply where required by Chapter 2"), 405 (ramps), 410 (platform lifts).

As described above and illustrated in the appended diagram, according to the District's design plans, the only way for wheelchair users to reach the front row of accessible seats is to enter through the right stage door and travel along the corridor adjacent to the stage and use the platform lift to descend to the accessible seating area.  A wheelchair user seated in the rear accessible seats who wishes to access the stage must exit by the rear doors, travel along the corridors to the right stage entrance door and then to the stage.  Plaintiff argues that these plans violate three sections of the Standards; (1) section 206.2.6 relating to accessible routes between accessible seating and performance areas, (2) section 206.3 relating to location of accessible routes, and (3) section 206.7 relating to platform lifts.  Defendant counters that the auditorium plans comport with the Standards and that in any event the modifications sought by Plaintiff would be "impossible."

Initially, I note that there is almost no caselaw to guide interpretation of the Standards at issue.  "Most ADA access cases settle.  For that reason, the case law in this area is relatively underdeveloped given the breadth of the statutory scheme and number of suits filed."  Feltenstein v. Wykagyl Ass. HJ, 184 F.Supp.3d 76 (S.D.N.Y. 2016).

### 1. Section 206.2.6 - accessible routes between accessible seating and performance areas

Plaintiff first argues that the New Middle School auditorium fails to comply with section 206.2.6 because it does not directly connect the seating areas with the performance area.  Doc. 63 at 17-20; Doc. 68 at 15-21.  Defendant counters that the planned accessible

routes between accessible seating and performance areas complies with section 206.2.6. Doc. 65-1 at 16-18, 28-30.[27]

Section 206.2.6, entitled "Performance Areas," provides in relevant part:

> Where a circulation path directly connects a performance area to an assembly seating area, an accessible route shall directly connect the assembly seating area with the performance area.

Standards § 206.2.6.[28] Although it is not a defined term, the term "performance area" in the context of the planned auditorium unambiguously refers to the stage. As previously noted, a circulation path is a "way of passage provided for pedestrian travel." Id. § 106.5.[29] There is no dispute that each of the four aisles is a circulation path connecting the seating area to the stage for those capable of walking. Therefore, the question in applying section 206.2.6 is whether the aisles "directly connect" the stage to the seating area, and if so, whether the District's intended accessible routes for wheelchair users also "directly connect" the stage to the seating area.

The Standards do not define the terms "directly" or "directly connects." However, it is beyond dispute that the auditorium seating area is directly connected to the stage via

---

[27]Defendant notes that Mr. Marinelli never raised an objection pursuant to section 206.2.6, and that Plaintiff's counsel raised it for the first time in a November 2020 telephone call, approximately one month before the present motion was filed. Doc. 65-1 at 16-17, 28. Based on my previous discussion, I conclude that Plaintiff sufficiently identified the issue by insisting that the lift could not be part of the accessible route to the seating area.

[28]The Standards denote defined terms by italicizing them throughout, however I will quote the Standards using standard font.

[29]The definition "include[es] but [is] not limited to, walks, hallways, courtyards, elevators, platform lifts, ramps, stairways, and landings." Standards § 106.5.

the circulation path of the aisles and steps. A student who is able to walk and who is seated anywhere in the auditorium can use one of the aisles to walk to the well and then use the steps on the right or left of the stage to ascend to the stage, and reverse that path to retake his or her seat.

Plaintiff does not dispute that wheelchair users sitting in the front row accessible seats have an accessible route that directly connects to the stage. These students can travel from their seats to the stage using the platform lift, and the Standards allow use of a platform lift to reach a performance area/stage from the front accessible seating area. Standards § 206.7.1; N.T. 04/08/21 at 22, 24-25 (no dispute that platform lift is a permissible use for this purpose).

The parties' dispute concerns students seated in the rear row wheelchair seats. As noted, the only route for wheelchair users seated in the rear row to reach the stage requires them to exit through the rear doors, make two left turns, travel down a hallway roughly parallel to the aisles inside the auditorium, and make two more left turns to reenter the auditorium through the right stage door, and proceed to the stage. Therefore, the issue for decision as to section 206.2.6 is whether this route is "direct."

I first dispose of one of the District's arguments. Seizing upon the language "an accessible route shall directly connect," the District maintains that there only needs to be one accessible route directly connecting accessible seating to the stage, and that because the front row seating satisfies section 206.2.6, it is not necessary for the rear row seating to do so. Doc. 65-1 at 28; LaBrake Dec. ¶¶ 78-79. This reading twists the regulatory language. The section states that "[w]here a circulation path directly connects" the stage

to the seating area, "<u>an</u> accessible route" shall also directly connect the stage to the seating area. Standards § 206.2.6 (emphasis added). This language unmistakably calls for an accessible path connecting a stage and seating area that corresponds to a circulation path connecting that same stage and seating area. Because the rear seats have a circulation path directly connecting them to the stage, so too the rear wheelchair seats must have an accessible path directly connecting to the stage.

Is the District's proposed accessible path from the rear seats to the stage "direct?" Not surprisingly, the parties answer the question differently. From Plaintiff's perspective, the route is not "direct" because it takes a student using a wheelchair outside the auditorium and along a series of hallways to reach the stage; whereas from the District's perspective the adjacent hallways lead directly from the rear seating to the stage. Doc. 63 at 18; Doc. 65-1 at 17, 29. Neither party defines the term. "Direct" is defined as "proceeding from one point to another in time or space without deviation or interruption," "not crooked, oblique, reflected, refracted, or circuitous," or "proceeding by the shortest way." Merriam-Webster Unabridged Dictionary, https://unabridged.merriam-webster.com/unabridged/direct (last accessed 5/4/21). Under any of these definitions, the term does not accurately describe the District's proposed route. The District's position seems to suggest that because the path is continuous it is direct, but those terms do not have the same meaning.

The parties also consult different sources to assist in interpreting the term "direct" in section 202.2.6. According to the District, the "prevailing industry interpretation" of section 202.2.6 is that a route is "direct" so long as it does not exit the building, does not

go to a different side/section of the building, and does not require a wheelchair user to pass through other rooms (like closets or kitchens) or potentially locked doors.  LaBrake Dec. ¶ 75; see also Doc. 65-1 at 17, 29; N.T. 04/08/21 at 55 (defense counsel defining "direct" as "[s]taying inside the building and following normal circulation paths within the building").  Plaintiff argues that the District's unspecified "industry" standards are not relevant to the court's interpretation of regulatory language, and also are self-serving declarations made by the very architects who designed the auditorium.  See Doc. 68 at 17.

Plaintiff instead looks to the history of the regulatory language.  Doc. 63 at 19-20. In drafting ADAAG in 2004, the provisions of which were incorporated in the Standards, the Access Board noted that the requirement that the accessible route "directly connect" the seating and performance areas was intended to "ensure that the accessible route to a performance area is comparable to the general circulation route," "otherwise, it may be possible to provide access to performance areas through a more circuitous route and still be in compliance."  69 Fed. Reg. 44,084, 44,093 (Jul. 23, 2004).  The DOJ explained that Section 206.2.6 was intended to change the prior provision, which could be read to allow routes between accessible seats and performance areas to "go outside the assembly area and use an indirect interior route."  DOJ, Final Regulatory Impact Analysis at 175, 395, 417 (July 23, 2010) (Doc. 63-10).  Similarly, in adopting ADAAG as part of the Standards, the DOJ indicated that Section 202.2.6 was intended to expand the accessibility required in assembly areas with performance stages from the previous ADA accessibility standards, which required an accessible route connecting accessible seating and the stage. See 75 Fed. Reg. 56,236, 56,313-14 (Sep. 15, 2010).  In doing so, DOJ weighed the

burdens and benefits of the enhanced requirement, and noted the importance of ensuring

that people who use wheelchairs can fully and equally participate in events in such

facilities:

> Many advocacy groups and individual commenters
> strongly supported the revised requirement, discussing the
> acute need for direct access to stages, as such access has an
> impact on a great number of people at important life events,
> such as graduations and awards ceremonies, at collegiate and
> competitive performances and other school events, and at
> entertainment events that include audience participation.
> Many commenters expressed the belief that direct access is
> essential for integration mandates to be satisfied, and that
> separate routes are stigmatizing and unequal. The Department
> agrees with those concerns.

Id. at 56,313. Defendant asserts that the court cannot rely on the DOJ-commissioned

Regulatory Impact Analysis for guidance because it was issued after the regulations were

adopted, and because it was prepared by an entity with a private economic interest. N.T.

04/08/21 at 53-55.

Taking into account the text, structure, history, and intent of the regulatory

standards, I conclude that the District's reading is untenable. As noted, the term "direct,"

while perhaps not unambiguous as applied to all potential scenarios, is not ambiguous as

applied to the current scenario and cannot fairly be used to describe the District's proposed

accessible route. I also find it inappropriate to rely on "industry standards" to understand

the regulation's meaning. I find much more relevant the regulatory history reflecting that

section 206.2.6 represented a change to add the requirement of a direct connection

between accessible seating areas and the stage, with the goal of making the stage more

accessible to audience members who use wheelchairs, comparable to the access of their able-bodied peers.

As Plaintiff pointed out at oral argument, <u>N.T.</u> 04/08/21 at 43-37, it is noteworthy that although section 206.2.6 contains the word "directly" twice, the District's interpretation of the section would result in the word having two different meanings. First, for non-disabled individuals, "directly" would mean a route entirely inside the auditorium by way of the aisles, and second, for people with disabilities, "directly" would mean a circuitous route involving exiting the auditorium, taking several turns and hallways, and reentering the auditorium. An interpretation adopting two meanings as disparate as these for the same term is not consistent with the mandates of the ADA, the language of section 206.2.6, or the history and intent of the regulations. For example, the District's interpretation has no outer limit, meaning that a wheelchair accessible route could be much longer than the one at issue here and still comply with the section, so long as it did not exit the building or go through other rooms. Such an unlimited reading cannot be what the Standards envisioned.

Defendant noted at oral argument that the term "space" is a defined term, whereas the term "area" is not. <u>N.T.</u> 04/08/21 at 51, 64; <u>see</u> Standards § 106.5 ("Space" defined as "A definable area, such as a room, toilet room, hall, assembly area, entrance, storage room, alcove, courtyard, or lobby."). Defendant argues from this that by referring to a "performance area" and "seating area" rather than performance or seating "space," section 206.2.6 is not intended to be restrictive and "is not written to say that the direct connection has to be within the same space." <u>N.T.</u> 04/08/21 at 51, 64. This argument stretches the

35

term "area" beyond it's normal and ordinary meaning to encompass the meaning of the term "directly connect." Whether the "performance area" or "seating area" is confined or expansive in nature, the requirement of a route directly connecting them remains.

The District makes an additional argument that bears mentioning. It asserts that "[m]ost people attending events in the auditorium remain in their seats for the duration of the proceedings," and that "most persons receiving awards know about it in advance, and generally, they sit near the stage so as to prevent having to traverse the length of the room." LaBrake Dec. ¶ 60; see also Doc. 65-1 at 14-15 & 29 n.18.[30] The District provides no legal authority for what would amount to an unwritten exception to the regulation's requirements. Nothing in the regulations supports an interpretation that would make accessibility contingent on the frequency with which an accessible route is used. To allow the District to provide a direct route between the stage and the accessible seats in only one part of the auditorium for persons with disabilities, while providing a direct route between the stage and the entire auditorium for people without disabilities, undermines the ADA's requirement for dispersion of accessible seats intended to allow wheelchair users choices comparable to non-disabled persons.[31]

---

[30]Defendant assumes that for purposes of assemblies, middle school students are told where to go and which entrance to use, and that they are therefore not given a choice as to which entrance or seats to use. N.T. 04/08/21 at 75 ("Students go down to the auditorium by class and they enter the auditorium by class and they sit where they are told to sit."). Even were this to be accepted as true for school assemblies, the same assumption would not necessarily apply for events such as plays or concerts attended by students, their families, and members of the community outside of school hours.

[31]The District also expresses concern that this interpretation would make it "impossible in many buildings" to maintain proper line-of-sight because the entire floor would have to meet the Standard's slope and area of respite requirements. LaBrake Decl.

For the aforementioned reasons, I conclude that the District's design for the auditorium does not comply with section 206.2.6.

### 2. Section 206.3 - the accessible path to the front of the auditorium

Plaintiff next argues that the auditorium fails to comply with Section 206.3 because the proposed accessible path to the front of the auditorium is separate from and longer than the general circulation paths used by able-bodied persons. Doc. 63 at 21-23; Doc. 68 at 21-26. Defendant counters that the plans for wheelchair accessibility to the front of the auditorium complies with Section 206.3. Doc. 65-1 at 11-16, 25-28.

Whereas the issue as to section 206.2.6 dealt with access between the seating and the stage, the issue here is access from outside the auditorium to the accessible seats. Section 206.3 addresses the location of accessible paths, and is not specific to an assembly area. It states in relevant part: "Accessible routes shall coincide with or be located in the same area as general circulation paths." Standards § 206.3. The Advisory to this section explains in relevant part:

> The accessible route must be in the same area as the general circulation path. This means that circulation paths, such as vehicular ways designed for pedestrian traffic, walks, and unpaved paths that are designed to be routinely used by pedestrians must be accessible or have an accessible route nearby.

Id. Advisory.

---

¶ 80. The District's impossibility argument will be addressed more fully later in this opinion, see infra at 42-43. Suffice it to say that the District's concern in this regard does not override the plain language of the regulation.

There is no dispute that the auditorium design provides an accessible route to the rear accessible seats that coincides with the circulation path used by non-disabled persons, because both walking and wheelchair students enter through the rear doors to reach the rear row. There also is no dispute that the general circulation paths for walking students to reach the seats at the front of the auditorium (the aisles) are not accessible paths due to the steep slope of the aisles and the absence of landings. As previously described, the District's proposed path is that wheelchair students enter through the right stage door, proceed along the corridor adjacent to the stage to reach the platform lift, and then descend to the front seating area. Clearly, this path does not coincide with the general circulation paths (aisles). Thus, the question is whether the proposed accessible path is in the "same area" as or "nearby" the general circulation paths.

As with the previous section, this determination comes down to terms that are familiar but undefined -- in this case "same" and "nearby" -- and again the parties disagree as to their meaning. From Plaintiff's perspective, the path to an entrance that is distant from the main entrance and that uses the platform lift to reach the front seating area is neither "in the same area" nor "nearby" the aisles which are the general circulation path. See, e.g., N.T. 04/08/21 at 72-73 (arguing that the routes do not have to entirely overlap, but they can diverge "only as much as necessary"). Plaintiff also argues that the District's accessible route is inconsistent with the Advisory Board's statement in its Technical Guide in reference to this provision that "[i]t promotes equivalency and precludes accessible routs that are obscure, hard to find, or that diverge from circulation paths more than necessary." Doc. 63 at 21; Doc. 63-5 at 3; N.T. 04/08/21 at 78. Defendant argues that the

proposed accessible route for wheelchairs satisfies section 206.3 because it is roughly parallel to the auditorium's aisles and is "simply on the other side of an interior wall." Doc. 65-1 at 15 (quoting LaBrake Dec. ¶ 65);[32] <u>N.T.</u> 04/08/21 at 76 ("[T]he accessible route has to be nearby.  Not in the same room, not in the exact same space, not identical, not equivalent, but nearby.").

Plaintiff again has the better argument.  The term "same" is defined as "resembling in every way," "conforming in every respect," and "corresponding so closely as to be indistinguishable."  Merriam-Webster Unabridged Dictionary, https://unabridged.merriam-webster.com/unabridged/same (last visited 5/4/21).  "Nearby" is defined as "near at hand" and "close by."  <u>Id.</u>, https://unabridged.merriam-webster.com/unabridged/nearby (last visited 5/4/21).  While the circulation path and the proposed accessible path reach the same place, it cannot fairly be said that they reach that place through paths that are either in the same area or nearby each other, using the plain and commonly recognized meaning of those terms.  One takes students from the rear entrance down the aisles, and the other takes students from the right stage entrance to the platform lift.  These entrances are at a significant distance from each other, and thus require non-disabled and wheelchair students to take different paths to the auditorium from their classroom or other starting point.  The proposed accessible route is clearly not equivalent, nor can it be fairly said to promote equivalency.

---

[32]The District and Ms. LaBrake err in stating that the hallway is on the other side of the auditorium wall.  As depicted in the appended diagram, there are rooms between the auditorium and the long corridor to the right, including lavatories and storage rooms.

Defendant makes a number of additional arguments in supports of its position. Defendant cites Oberloh v. Eclips Hair Design, 2015 WL 1064609 (N.D. Ind. 2015), which arose in the context of a motion for contempt for the defendant's alleged violation of a consent decree. Oberloh is one of few cases interpreting the Standards, but it does not support the District's position. The dispute involved an accessible path from a van-accessible parking space to defendant's hair salon, and the plaintiff contended that the accessible route was not in the same area as the general circulation path in violation of section 206.3. The court denied the plaintiff's motion. "Defendant's business has only one entrance . . . , everyone must use the same general paths and walkways to get to the entrance form the parking lot[, and] [t]he access route exactly parallels and in some areas overlaps with that path." Id. at *4. Thus, the facts in Oberloh are easily distinguished, because here the proposed accessible path does not parallel or overlap the circulation path.

Defendant also cites the 2018 International Building Code ('IBC'), which Ms. LaBrake states are "routine[ly] relied upon by architects and engineers. LaBrake Dec. ¶¶ 66-67. IBC section 1104.5 contains language identical to section 206.3, adding that "[w]here only one accessible route is provided, the accessible route shall not pass through kitchens, storage rooms, restrooms, closets, or similar spaces." LaBrake Dec. Exh. 3 (Doc. 65-7 at 22). The commentary states that "the intent of this section is to avoid the circumstance where an interior path between facilities is provided but the only accessible route between those facilities is an exterior path." Id. Therefore, according to the District, an accessible path is permitted to pass through a different hallway, but cannot pass through

other rooms which may be locked or otherwise have restricted access, which its proposed

accessible path does not do.  Id. ¶ 68.

The IBC building code is of limited value to interpreting section 206.3.  First,

although one of Plaintiff's accessibility consultants states that the IBC has been adopted in

some jurisdictions, Declaration of Marsha K. Mazz, Doc. 68-3, ¶ 17, neither side contends

that IBC binds this court's interpretation of the Standards.  Second, while the first two

sentences of section 206.3 and IBC § 1104.5 are virtually identical, the specific language

of IBC § 1104.5 that the District relies on -- "[w]here only one accessible route is

provided, the accessible route shall not pass through kitchens, storage rooms, restrooms,

closets or similar spaces" – is notably absent from section 206.3.  Therefore, it cannot be

inferred that the DOJ or the Access Board concurs with the suggested interpretation, and

in fact the opposite inference is more likely correct.  In any event, the fact that the IBC

provides that an accessible route should not pass through other rooms does not compel the

corollary conclusion that an accessible route complies so long as it does not pass through

other rooms.

Defendant also relies on section 405 of the Standards to support its position that the

auditorium complies with section 206.3.  As referenced in the fact summary, supra at 5

n.8, that section sets the maximum slope for ramps (1:12 or 8.33%) and requires landings

every thirty feet, specifications that the aisles do not meet.  However, section 405 contains

an exception:  "In assembly areas, aisle ramps adjacent to seating and not serving elements

required to be on an accessible route shall not be required to comply with 405."  Id.

§405.1.  The District argues that, reading the Standards as a whole, this exception informs

the acceptable location of accessible routes. Doc. 65-1 at 26. The District argues that aisles adjacent to seating are permitted to exceed slopes for accessible routes and are not required to have landings that would otherwise be required for accessible routes, in order to maintain adequate line-of-sight as required by other provisions of the Standards. Id. at 12 (citing LaBrake Dec. ¶¶ 42-43; Standards § 802.2).[33] According to the District, "[i]n many buildings, it would be impossible to maintain adequate line-of-sight if the main floor of an auditorium seating area had to be structured the same as an ADA-compliant accessible path. . . . For these reasons, *most* modern auditoriums have accessible paths for wheelchair users that are somewhere *other than* the slope of the main floor." Id. at 12-13 (citing LaBrake Dec. ¶¶ 44-45, 48 (emphasis in original)).

Defendant reads too much into the exception provided in section 405.1. The plain language of the exception is that aisle ramps are not required to be part of an accessible path to the seating areas. This does not mean that aisle ramps can never be part of an accessible path, or that aisle ramps are exempted from being part of an accessible path if the planned design contains no alternative accessible path.[34] Defendant seems to suggest that Plaintiff's position would compel it to use the aisles as the accessible path, but that if

---

[33]Section 802 of the Standards pertains to "Wheelchair Spaces, Companion Seats, and Designated Aisle Seats." Section 802.2 requires that spectators seated in wheelchair spaces be afforded lines of sight over heads and between heads comparable to the lines of sight of other spectators. Standards § 802.2.1.

[34]Plaintiff points out that in its Technical Guide, the Access Board addressed section 405's requirement for handrails on accessible routes in assembly areas, noting that "[a]isle ramps that are part of an accessible route can have handrails on at least one side." Doc. 68 at 25 (citing U.S. Access Board, Technical Guide – Ramps and Curb Ramps (Doc. 63-6), at 7). This supports the notion that aisles can be part of an accessible route.

it did so it would fail to comply with the line of sight requirements, forcing it to choose which provision to violate. However, the District does not seriously argue that it is impossible to design the auditorium to be in compliance with the Standards, and indeed Ms. Labrake states only that "most" modern buildings do not use auditorium aisles as accessible paths. Rather, it seems that the District has chosen to design the auditorium in such a way that makes it difficult to do so.

Policy considerations also favor Plaintiff's interpretation of section 206.3. In addition to imposing distinct routes on wheelchair users to access the front accessible seats before and after an auditorium event, the District's proposed accessible route would require them to use a different path if they needed to leave their seats during the event, which is likely to lead to embarrassment or stigma. For example, once seated in the wheelchair accessible seats in the front row, if a student needed to use the bathroom during an event, the student would have to use the platform lift to ascend to the stage level, and then exit the right stage door to access one of the lavatories. All other students can use the aisles to exit toward the rear, in a direction away from the stage where the audience's eyes are generally directed. Only the wheelchair students would have to leave the seating area by passing in front of the stage on the way to the platform lift, which is inconsistent with the goals of the 2010 ADA Standards, which are explicitly to "promote inclusion, reduce stigma and potential embarrassment, and combat isolation, segregation, and second-class citizenship of individuals with disabilities." 75 Fed. Reg. at 56,241.

For the aforementioned reasons, I conclude that the District's design for the auditorium does not comply with section 206.3.

### 3. Section 206.7 – the platform lift

Plaintiff next argues that the auditorium fails to comply with Section 206.7 of the Standards related to platform lifts. Doc. 63 at 23-25; Doc. 68 at 27. Defendant counters that the auditorium complies with section 206.7. Doc. 65-1 at 18-19, 30-32. As noted, Plaintiff concedes that the proposed platform lift is permitted to provide an accessible route to the stage from the front row seats. Doc. 63 at 25 n.9 (citing Standards § 206.7.1); N.T. 04/08/21 at 83-84. At issue is the District's plan to use the lift as part of the accessible route to reach the front seats.[35]

Section 206.7, entitled "Platform Lifts," provides in relevant part that "[p]latform lifts shall be permitted as a component of an accessible route in new construction." Standards § 206.7. It further provides that "[p]latform lifts shall be permitted to provide an accessible route to comply with the wheelchair space dispersion and line-of-sight requirements of 221 and 802." Id. § 206.7.2.

According to Plaintiff, platform lifts may only be part of an accessible route to reach wheelchair seating if necessary to achieve dispersion of wheelchair seating and/or to

---

[35]I have already held that the District's proposed accessible path to the front row seats violates section 206.3, but will also address whether section 206.7 provides an independent basis for finding fault with the District's plan. Defendant maintains that Plaintiff abandoned this challenge by stating that the issue of the platform lift was "closed." Doc. 65-1 at 11 n.7; see supra at 10; Doc. 65-10 at 12 (Issue 88). However, as previously noted, the District had identified the lift as the means by which wheelchair users would travel between the front row seating and the stage, which Plaintiff concedes is a permissible use, and it was unclear that the District also intended the lift to be part of the accessible route for wheelchairs to access the front row seat. N.T. 04/08/21 at 22-25.

comply with line-of-sight requirements. Standards § 206.7.2.[36] Plaintiff believes that the lift is not necessary to comply with those requirements. Doc. 63 at 24-25 (citing Marinelli Dec. ¶¶ 49-53). Plaintiff also relies on the justifications for restricting the use of platform lifts to reach seating areas, including (1) platform lifts can only be used by one person at a time and so they impede people using wheelchairs from entering and leaving the space, (2) they require routine maintenance which can be overlooked and result in no access when the lift is inoperable, (3) they draw attention to the user, and (4) they require parents or other caregivers to separate from those who must use the lift because platform lifts cannot be used by non-disabled people. Marinelli Dec. ¶ 52; N.T. 04/08/21 at 87.

The District takes the contrary position, asserting that the wheelchair lift is necessary to meet dispersion and line-of-sight requirements. Doc. 65-1 at 30-31. Section 221.2.3 requires, among other things, horizontal and vertical dispersion of wheelchair-accessible seating. 2010 ADA Standards § 221.2.3.[37] The District's experts opine that providing an accessible route between the stage and front seating area would be extremely

---

[36]The DOJ explained the line-of-sight and dispersion requirements as follows: "Consistent with the overall intent of the ADA, individuals who use wheelchairs must be provided with equal access so that their experience is substantially equivalent to that of other members of the audience." Standards § 221.2.3 Advisory. Line-of-sight requirements ensure that people seated in wheelchair accessible spaces will be able to see the event or performance. Id. § 802.2. Dispersion requirements provide that assembly areas with more than 300 seats disperse the accessible seating vertically and horizontally. Id. §§ 221.2.3.1, 221.2.3.2.

[37]"Horizontal dispersion of wheelchair spaces is the placement of spaces in an assembly facility seating area from side-to-side." Standards § 221.2.3.1 Advisory. "When wheelchair spaces are dispersed vertically . . . they are placed at different locations within the seating area from front-to-back so that the distance from the . . . stage . . . is varied among wheelchair spaces." Id. § 221.2.3.2 Advisory.

difficult without the use of a lift because the stage is four feet and two inches higher than the floor of the front of the seating area -- a difference in elevation that is necessary to ensure that all audience members have adequate line-of-sight. Thus, the lift is necessary to comply with the dispersion requirements of section 221 and the line-of-sight requirements of section 802, and therefore complies with section 206.7. LaBrake Dec. at ¶ 85.

Interpretation of section 206.7 also seems to come down to familiar but undefined terms. A platform lift is "permitted to provide an accessible route <u>to comply</u> with" dispersion and line-of-sight requirements. The parties seem to agree that the underlined language means "necessary to comply" with such requirements. Although this construction adds a term to the regulatory language, I accept the parties' construction. Without inserting the term "necessary," the provision could be read to allow an entity extremely wide latitude in relying on dispersion or sight factors to be accommodated by lifts, which is clearly not the intention of the language.

But having agreed that the term "necessary" is the linchpin of this provision, the parties' arguments ascribe different meanings to the term. The term is defined as "that cannot be done without," or "absolutely required." Merriam-Webster Unabridged Dictionary, https://unabridged.merriam-webster.com/unabridged/necessary (last visited 5/4/21). This language suggests, when read in context with the other language in section 206.7, that a platform lift can be part of an accessible path to wheelchair seating only when there is no other way to maintain dispersion and line of sight requirements.

Defendant has explained the dispersion and line of sight requirements, but does not establish that it could not design around those requirements by a method other than the lift.

Plaintiff argues that use of the lift is necessitated not by dispersion and line of sight requirements but by the District's own design choices, and that those choices were not the only ones available when designing an auditorium in a newly constructed building. Second Declaration of Dominic Marinelli Dec. ¶ 22 (Doc. 68-4); N.T. 04/08/21 at 58-60 (introducing diagram with an alternative route, filed at Doc. 72-1), 91-92; see also Doc. 63-3 at 14 (Plaintiff-provided design concept that would be compliant); Doc. 68-4 at 5-10 (District's recently-built high school auditorium is compliant).

I am aware that the District faced many challenges in designing a building to meet a myriad of ADA and other requirements. Nevertheless, I am not persuaded that the District had no other design options than the lift it proposes. As noted, the District does not argue that a compliant auditorium would be impossible, only that it would be difficult. I decline to authorize the District to use the platform lift as part of an accessible path to the front seating area without a true showing of necessity.

For the aforementioned reasons, I conclude that the District's design for the auditorium does not comply with section 206.7 of the 2010 ADA Standards.

## IV.   RELIEF

There remains the issue of the appropriate relief. Plaintiff's proposed order would require the District to cease construction and then sets forth a procedure for the District to submit revised plans and for Plaintiff to object. Doc. 62-2. I will not require the District to cease construction, but will leave it to the District to best determine how to manage its resources in light of this ruling and the Consent Decree, which otherwise remains in effect. I will adopt a procedure similar to that contained in the Consent Decree for revisions

attributable to this ruling, with the adjustment that Plaintiff will have a defined time limit for any future motion to enforce the Consent Decree. That schedule will control, rather than the schedule in paragraph 3(b) of the Consent Decree.

## V.  <u>CONCLUSION</u>

Plaintiff's motion to enforce the Consent Decree is proper, as it is neither moot nor precluded by the doctrine of laches. Moreover, Defendant is not entitled to a modification of the Consent Decree to eliminate the paragraph upon which Plaintiff's motion is based. Defendant's cross-motion for modification of the Consent Decree will therefore be denied.

On the merits, Defendant's plan for the New Middle School's auditorium does not comply with Sections 206.2.6, 206.3, and 206.7 of the 2010 ADA Standards. Accordingly, Plaintiff's motion will be granted.

An appropriate Order follows.



FLOOR ELEV: -4'-2"

ACCESSIBLE ROUTE FROM FRONT OF AUDITORIUM TO STAGE

FLOOR ELEV: 0

ACCESSIBLE ROUTE FROM BACK OF AUDITORIUM TO STAGE.